**Sean GREENE, Plaintiff–Appellee,**

v.

**LONG ISLAND RAILROAD COMPANY, Barbara A. Arias, Thelma Schulman, Defendants,**

---

**Metropolitan Transportation Authority,**
**Defendant–Appellant.**

**Docket No. 00–9292.**

United States Court of Appeals,
Second Circuit.

Argued May 2, 2001.

Decided Feb. 11, 2002.

Michael Flynn, Garden City, N.Y. (Elkind, Flynn & Maurer, Garden City, NY, on the brief), for Plaintiff–Appellant.

Thomas J. Schwarz, New York, N.Y. (Jeffrey Glekel, John P. Furfaro, Skadden, Arps, Slate, Meagher & Flom, New York, NY, on the brief), for Defendant–Appellant.

Before MESKILL and KEARSE, Circuit Judges, and SQUATRITO, District Judge.*

KEARSE, Circuit Judge

Defendant Metropolitan Transportation Authority ("MTA" or the "Authority") appeals pursuant to 28 U.S.C. § 1292(b) from an interlocutory order of the United States District Court for the Eastern District of New York, Leonard D. Wexler, *Judge*, denying its motion for summary judgment dismissing the personal injury claims asserted against it by its employee Sean Greene under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 (1994) ("FELA" or the "Act"). In an opinion reported at 99 F.Supp.2d 268 (2000), the district court denied the motion on the ground that, as owner and operator of defendant Long Island Railroad Company ("LIRR"), which MTA acknowledges is a railroad engaged in interstate commerce, MTA is a "common carrier by railroad" within the meaning of the Act. On appeal, MTA contends that the railroad is "operated" only by LIRR, not MTA, and that the district court's ruling was thus erroneous. For the reasons that follow, we disagree and affirm the order of the district court.

## I. BACKGROUND

The following facts, along with others discussed in Part II.B. below, do not appear to be in dispute. MTA is a public benefit corporation created by the New York State Public Authorities Law ("Public Authorities Law"). *See* N.Y. Pub. Auth. L. §§ 1263(1), 1264(2) (McKinney 1999). The Public Authorities Law describes MTA's responsibilities as including

the continuance, further development and improvement of commuter transportation and other services related thereto within the metropolitan commuter transportation district, *including but not limited to such transportation by railroad,* omnibus, marine and air, in accordance with the provisions of this title.

---

* Honorable Dominic J. Squatrito, of the United States District Court for the District of Connecticut, sitting by designation.

*Id.* § 1264(1) (emphasis added). With exceptions not pertinent here, MTA is given the power to "acquire . . . any transportation facility," *id.* § 1266(1), and, *inter alia,* to "operate, maintain, renovate, improve, . . . or repair" such a facility and "lease railroad cars for use in its passenger service," *id.* §§ 1266(2) and (7). MTA may levy and collect fares, and it may establish schedules, standards of operation, and public safety rules and regulations as necessary for the "use and operation of any transportation facility." *Id.* § 1266(3). MTA may exercise these powers itself or it may "cause one or more of its powers . . . to be exercised or performed by[ ] one or more wholly owned subsidiary corporations." *Id.* § 1266(5). MTA wholly owns two subsidiaries that are commuter railroads: LIRR and Metro–North Commuter Railroad Company ("Metro–North").

Prior to 1998, LIRR maintained its own police force. Greene was employed by LIRR as a police officer from April 1991 through December 1997. His duties consisted principally of conducting surveillance at parking lots at railroad stations maintained by LIRR, in order to detect and deter thefts of and robberies from parked vehicles. In 1997, the Public Authorities Law authorized MTA to provide and maintain a police department for all MTA affiliates, including LIRR. *See id.* § 1266–h(1). Pursuant to this provision, MTA consolidated police services effective January 1, 1998, forming the "MTAPD," and all LIRR police officers became MTA employees, *see id.* § 1266–h(2) (initial appointments to MTA police force to be "all incumbent police officers from [LIRR] and/or . . . Metro–North"). On that date, as a result, Greene became an MTA employee and was no longer an employee of LIRR. Greene was assigned to MTAPD's Auto Crime Unit; his duties as an MTA police officer continued to consist primarily of surveilling LIRR parking lots.

The present action arises out of a vehicular accident that occurred while Greene was on duty on March 4, 1998. Greene and fellow officer John Wyckoff were dispatched by a radio operator to respond to a report of car theft at the LIRR station in Ronkonkoma, New York. The officers proceeded in a jeep, driven by Wyckoff, which was owned by LIRR ("LIRR jeep"). En route to the Ronkonkoma station, the LIRR jeep collided with a car driven by defendant Barbara Arias and owned by defendant Thelma Schulman. Greene alleges that the collision caused him disabling injuries; in addition to asserting claims against Arias and Schulman, he asserts claims against MTA pursuant to FELA and against LIRR pursuant to FELA and state law. The complaint alleges that MTA was negligent in failing to provide Greene with safe working conditions, including by failing to equip the jeep with a siren and adequate emergency lights and flashers; in operating the vehicle in such a negligent manner as to cause an accident; and in failing to enact or enforce safety rules for personnel in Greene's workplace.

Following discovery, MTA and LIRR jointly moved for partial summary judgment dismissing the claims asserted against them under FELA. While conceding that LIRR is a railroad engaged in interstate commerce, they argued principally (a) that LIRR could not be held liable under FELA because at the time of the accident it was not Greene's employer, and (b) that MTA could not be held liable under FELA because it is not a common carrier by railroad within the meaning of the Act. MTA argued that LIRR operates its own "transportation facilities" and that MTA's involvement with LIRR is limited to indirect support functions such as " 'coordinat[ing] the planning and overall policies of its agencies, approv[ing] operating and capital budgets and performance

plans, and monitor[ing] financial and operating activities,'" *Greene v. Long Island R. Co.*, 99 F.Supp.2d at 273 (quoting MTA letter to United States Railroad Retirement Board dated December 17, 1997, at 1) (alterations ours); *see* also MTA's Memorandum of Law in Support of Motion for Reconsideration at 9.

The district court denied the motion. Finding that "it is not the corporate form of the entity that is dispositive" in "determining whether a defendant is a common carrier," 99 F.Supp.2d at 272, the court reviewed both MTA's functions and MTA's public characterizations of its role in railroad operations. The court noted that the legislation creating MTA "charges it with the 'continuance, further development and improvement of commuter transportation and other services related thereto,'" 99 F.Supp.2d at 272 (quoting N.Y. Pub. Auth. L. § 1264(1)), and that

> [t]o these ends, the MTA has broad powers including the power to:
>
> - acquire transportation facilities;
> - "establish, construct, effectuate, operate, maintain, renovate, improve, extend or repair" any facility acquired;
> - establish and collect fares and tolls;
> - establish standards of operation and rules and regulations regarding the conduct and safety of the public;
> - lease railroad cars for use in passenger service and,
> - "do all things it deems necessary, convenient or desirable to manage, control and direct the maintenance and operation of transportation facilities, equipment or real property operated by or under contract, lease or other arrangement" with MTA.
>
> N.Y. Pub. Auth. L. § 1266(1)-(8).

99 F.Supp.2d at 272. The court observed that

MTA refers to itself as the "largest public transportation provider in the Western Hemisphere." CFO's Letter of Transmittal dated March 27, 1997, Comprehensive Annual Financial Report of MTA for year ended December 31, 1997. 99 F.Supp.2d at 272. Further,

> [w]hen describing its functions, the MTA states that it "coordinates the planning and overall policies of its agencies, approves operating and capital budgets and performance plans, and monitors financial and operating activities of its agencies." The MTA also states that it "is responsible for certain cross agency support functions." The MTA characterizes its subsidiary agencies, including its commuter rails as "serv[ing] the public by operating the transportation facilities." Letter dated December 17, 1997 from MTA to General Counsel, U.S. Railroad Retirement Board....

While the MTA's component units are certainly responsible for providing transportation services, the MTA itself is intimately involved in the management, not only of its subsidiaries' finances, but of their real estate and other assets. Thus, the MTA states that the "careful management" of its real estate assets has included a leaseback transaction for the LIRR Hillside maintenance facility, where LIRR trains are repaired and maintained, which transaction produced approximately $22 million in capital funds for the MTA. Funds so obtained, along with other MTA funds are used, *inter alia,* for repairing and upgrading railroad infrastructure, building new facilities and buying new equipment.

The MTA has significant involvement in the marketing of the transportation services available through its subsidiary and component units. The MTA website refers to all transportation facilities

(including the LIRR) as part of the "network" of MTA services. Riders are referred to as "MTA customers." Among other things, the MTA takes credit for "offer[ing] the region efficient, environmentally sound travel alternatives."
99 F.Supp.2d at 273–74. The court concluded that by virtue of its "extensive involvement" in LIRR's activities, MTA "operates" a common carrier according to the plain meaning of that word, and that suit against MTA under FELA is permissible because Greene "is no less employed by a common carrier today than when he performed the same duties when employed by the LIRR." *Id.* at 274.

The court cautioned that its holding that MTA may be sued under FELA is "limited to those employees of MTA who are engaged in the interstate common carrier operations of its commuter rails," and does not extend to workers who are employed strictly in MTA's intrastate operations or its nonrail operations, such as employees of the New York City Transit Authority or the Triborough Bridge and Tunnel Authority. *Id.* at 275 ("The mere interconnectedness of these entities through MTA does not transform those entities into common carriers engaged in interstate commerce.").

Finding that its denial of summary judgment for MTA "involve[d] a controlling question of law concerning the MTA's status under FELA ... and [that] an immediate appeal from the Order may materially advance the ultimate termination of this litigation," the district court certified the issue of whether MTA is a common carrier for interlocutory appeal. *See* Order of Certification, August 16, 2000 at 1. This Court granted MTA's motion for leave to appeal pursuant to 28 U.S.C. § 1292(b).

## II. DISCUSSION

On appeal, MTA argues that it cannot be considered a "common carrier" for purposes of FELA because, rather than operating a railroad, it is only "involv[ed] in the performance of certain marketing, financial and real estate management functions for [LIRR]." (MTA brief on appeal at 2.) For the reasons that follow, we disagree.

### A. The Scope of FELA

■ FELA, which is "a broad remedial statute" whose objective is "to provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer," and which is to be "liberal[ly] constr[ued]" to achieve that objective, *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561–62, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987) (internal quotation marks omitted), provides, in part, that

[e]very common carrier by railroad while engaging in [interstate or foreign] commerce ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. As amended in 1939, this provision covers

[a]ny employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce.

*Id.* "The test for coverage under the amendment is not whether the employee is engaged in transportation, but rather whether what he does in any way furthers

or substantially affects transportation." *Reed v. Pennsylvania R. Co.*, 351 U.S. 502, 505, 76 S.Ct. 958, 100 L.Ed. 1366 (1956). "Nor are the benefits of the Act limited to those exposed to the special hazards of the railroad industry." *Id.* at 505–06, 76 S.Ct. 958; *see id.* at 503, 506, 76 S.Ct. 958 (clerical employee in charge of filing maintenance-related tracings of railroad's cars, engines, and tracks, *inter alia*, injured when a cracked window pane in her office blew in, was covered by FELA).

FELA defines the term "common carrier" to "include the receiver or receivers or other persons or corporations charged with the duty of the management and operation of the business of a common carrier." *Id.* § 57. The term is not otherwise defined, and most of the pertinent cases construing the applicability of FELA, or of analogous federal statutes, to a given employer have been concerned with whether the employer was a "carrier," or a "common" carrier, or a "railroad."

In *Wells Fargo v. Taylor*, 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205 (1920), the Supreme Court considered whether Wells Fargo, an express shipping company that had purchased carriage on an unaffiliated railroad, was itself a "common carrier by railroad" within the meaning of FELA. The Court concluded that it was not, because Wells Fargo was not the operator of the railroad:

> In our opinion the words "common carrier by railroad," as used in the act, mean one who operates a railroad as a means of carrying for the public,—that is to say, a railroad company acting as a common carrier. This view not only is in accord with the ordinary acceptation of the words, but is enforced by the mention of cars, engines, track, roadbed, and other property pertaining to a going railroad. . . .

*Id.* at 187–88, 41 S.Ct. 93. In *Edwards v. Pacific Fruit Express Co.*, 390 U.S. 538, 88 S.Ct. 1239, 20 L.Ed.2d 112 (1968), the defendant sued under FELA was a refrigerator car company that owned, maintained, and repaired refrigerator cars that it leased to railroads for transport of perishable products in interstate commerce; it also owned switching tracks to facilitate its repair of such cars. The Court concluded that the company was not covered by FELA, noting that "there exist a number of activities and facilities which, while used in conjunction with railroads and closely related to railroading, are yet not railroading itself." *Id.* at 540, 88 S.Ct. 1239; *cf. Robinson v. Baltimore & Ohio R. Co.*, 237 U.S. 84, 35 S.Ct. 491, 59 L.Ed. 849 (1915) (porter employed by Pullman Company, which paid his salary and controlled his work on a railroad car that was owned by Pullman but was hauled by an independent railroad was not an employee of the railroad).

In *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911), the Court considered whether the granting of preferential treatment to a customer by Southern Pacific Terminal Co. ("SP Terminal"), an operator of wharfage facilities, was within the jurisdiction of the Interstate Commerce Commission ("ICC") under the Interstate Commerce Act, c. 104, 24 Stat. 379 (1887) (codified, as amended, in various sections of 49 U.S.C.), which prohibited, *inter alia*, undue customer preferences by "railroad[s]." SP Terminal was chartered to construct and maintain wharves and docks for the accommodation of vessels, not to operate a railroad. However, the statute defined the term "railroad" to include "all bridges and ferries used or operated in connection with any railroad," *Southern Pacific Terminal*, 219 U.S. at 523, 31 S.Ct. 279 (internal quotation marks omitted). Moreover, SP Terminal was 99% owned by the Southern

Pacific Company, which also owned 99% of several separately and individually incorporated railways; and SP Terminal owned the only track facilities available for movement of railroad cars between ships and the tracks of one of the railroads. The Supreme Court, noting that SP Terminal's property created a "unity of the railroad's lines and the terminal facilities," *id.* at 522, 31 S.Ct. 279, and was "necessary in the transportation or delivery of the interstate and foreign freight transported by the lines of the Southern Pacific system," *id.* at 523, 31 S.Ct. 279 (internal quotation marks omitted), concluded that SP Terminal's operations were within the jurisdiction of the ICC, despite the fact that SP Terminal itself owned no cars, no locomotives, no stock in any of the railroads, and issued no bills of lading. The Court found that one

> important fact is the control of the properties by the Southern Pacific Company through stock ownership. There is a separation of the companies if we regard only their charters; there is a union of them if we regard their control and operation through the Southern Pacific Company. This control and operation are the important facts to shippers. It is of no consequence that by mere charter declaration the terminal company is a wharfage company, or the Southern Pacific a holding company. Verbal declarations cannot alter the facts. The control and operation of the Southern Pacific Company of the railroads and the terminal company have united them into a system of which all are necessary parts, the terminal company as well as the railroad companies . . . . the terminal company was organized to furnish terminal facilities for the system at the port of Galveston; and . . . shipments on the railroad lines from and to points in different states of the Union pass and repass over the docks of the terminal com-

pany. It forms a link in this chain of transportation. It is necessary to complete the avenue through which move shipments over these lines owned by a single corporation.

*Id.* at 521–22, 31 S.Ct. 279 (internal quotation marks omitted). The Court stated that

> a corporation such as this terminal company, which has competing lines, should not be permitted to defeat the jurisdiction of th[e] Commission by showing that it is not in fact owned by any railroad company. . . . The terminal company is part and parcel of the system engaged in the transportation of commerce, and to the extent that such commerce is interstate the Commission has jurisdiction to supervise and control it within statutory limits. To hold otherwise would in effect permit carriers generally, though the organization of separate corporations, to exempt all of their terminals from [the ICC's] regulating authority.

*Id.* at 522, 31 S.Ct. 279 (internal quotation marks omitted). The Court rejected the defendants' contentions that the parent company and each of the subsidiaries must be viewed independently of one another merely because they were separately incorporated:

> The record does not present a case of stock ownership merely or of a holding company which was content to hold. It presents a case, as we have already said, of one actively managing and uniting the railroads and the terminal company into an organized system. And it is with the system that the law must deal, not with its elements. Such elements may, indeed, be regarded from some standpoints as legal entities; may have, in a sense, separate corporate operation; but they are directed by the same paramount and combining power and made

single by it. In all transactions it is treated as single. In the ordinance of the city of Galveston, in the act of 1899, of the legislature of the state, and in public circulars and in the lease of [the favored customer], it is the system which is dealt with, and not its separate links. And, we have seen, the terminal facilities which the Terminal Company was authorized to maintain were for the system, not for the corporate elements considered separately.

*Id.* at 523–24, 31 S.Ct. 279.

In *United States v. Union Stock Yard & Transit Co.*, 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226 (1912), an action to enjoin various violations of the Interstate Commerce Act, the Court considered whether the Union Stock Yard & Transit Company of Chicago ("Stock Yard Company"), organized to maintain a stockyard, was a railroad within the meaning of that statute. Stock Yard Company, more than 90% of whose stock was owned by a holding company, Chicago Junction Railways & Union Stock Yards Company, was authorized to operate normal stockyard facilities for loading, unloading, and caring for freight. It was also authorized to own and operate a railroad system, moving rail cars to and from trunk lines for transportation to and from points outside of the state. At some point, Stock Yard Company leased the latter aspect of the business to an entity that eventually became known as Chicago Junction Railway Company ("Junction Company"), nearly all of whose stock was owned by the same holding company that owned Stock Yard Company. Junction Company thereafter performed the railroad services and paid Stock Yard Company "two-thirds of the profits received by the Junction Company for performing the service in connection with the railroad transportation." *Id.* at 303, 33 S.Ct. 83. That "joint service [then took] the place of the single service formerly rendered by the Stock Yard Company." *Id.* "In view of this continuity of operation, the manner of compensation and the performance of services in connection with interstate transportation by railroads," *id.*, the Supreme Court concluded that the two companies,

> because of the character of the service rendered by them, their joint operation and division of profits and their common ownership by a holding company, are to be deemed a railroad within the terms of the act of Congress to regulate commerce, and the services which they perform are included in the definition of transportation as defined in that act.... [T]he Stock Yard Company did not exempt itself from the operation of the law by leasing its railroad and equipment to the Junction Company, for it still receives two-thirds of the profits of that company and both companies are under a common stock ownership with its consequent control,

*id.* at 306, 33 S.Ct. 83.

In *United States v. Brooklyn Eastern District Terminal*, 249 U.S. 296, 39 S.Ct. 283, 63 L.Ed. 613 (1919), the Court considered whether the Brooklyn Eastern District Terminal ("Terminal" or "Brooklyn Terminal"), chartered not as a railroad but as a navigation corporation, was a railroad within the meaning of the Hours of Service Act, 45 U.S.C. § 61 *et seq.*, *repealed by* Pub. L. No. 103–272, § 7(b), 108 Stat. 1379 (1994), which prohibited any "common carrier operating a railroad" in interstate commerce from requiring or permitting an employee to remain on duty for more than 16 consecutive hours. In connection with its business of transporting merchandise on boats in New York harbor and adjacent waters, Brooklyn Terminal, under individual contracts with 10 interstate railroads and several steamship companies, operated a freight station at which it received

freight for transport to its Brooklyn docks. The Court stated that the precise question before it was

> whether the fact that the Terminal conducts these operations, not as an integral part of a single railroad system but wholly as an agent for one or several, exempts the railroad companies, because they are not the employer and exempts the Terminal, because it is not a common carrier.

249 U.S. at 305, 39 S.Ct. 283. The Court concluded that although Brooklyn Terminal did not hold itself out as a common carrier, did not itself own the railroad cars that traveled over its tracks, and had tracks that covered only a short route, it must be considered a common carrier by railroad given that the services it rendered were public in nature and of a kind ordinarily rendered by a common carrier:

> In no respect ... d[id] the service actually performed by the Terminal for or in respect to shippers differ from that performed by the railroad companies at their other stations. True, the service is performed by the Terminal under contracts with the railroad companies as agent for them and not on its own account. But a common carrier does not cease to be such merely because the services which it renders to the public are performed as agent for another.

*Id.* at 306–07, 39 S.Ct. 283.

In *United States v. State of California*, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936), the Court considered whether the State of California, in the operation of its State Belt Railroad to serve some 175 industrial plants, was a "common" carrier within the meaning of the Safety Appliance Act, 45 U.S.C. § 1 *et seq., repealed by* Pub. L. No. 103–272, § 7(b), 108 Stat. 1379 (1994), which prohibited such companies from using rail cars with defective coupling equipment. Though the State maintained that it was not a "common" carrier because it, *inter alia*, maintained no freight station and issued no bills of lading, the Court concluded that

> [a]ll the essential elements of interstate rail transportation are present in the service rendered by the State Belt Railroad. They are the receipt and transportation, for the public, for hire, of cars moving in interstate commerce.... Its service, involving as it does the transportation of all carload freight moving in interstate commerce between the industries concerned and all railroad and steamship lines reaching the port, is of the same character, though wider in scope, as that held to be common carriage by rail in interstate commerce in the *Brooklyn Terminal* and the *Union Stockyards* cases. They abundantly support the conclusion that such is the service rendered by the state in the present case....

297 U.S. at 182–83, 56 S.Ct. 421.

The matter of intra-corporate-family responsibility, discussed in *Southern Pacific Terminal*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310, and *Union Stock Yard & Transit*, 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226, was revisited in *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), in which the United States brought suit under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, against a parent corporation for the costs of cleaning up industrial waste generated at a chemical plant owned by its subsidiary. CERCLA imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility." 42 U.S.C. § 9607(a)(2). The question before the Supreme Court in *Bestfoods* was "whether a parent corporation that actively participated in, and exercised control over, the oper-

ations of a subsidiary may, *without more,* be held liable as an operator of a polluting facility owned or operated by the subsidiary." 524 U.S. at 55, 118 S.Ct. 1876 (emphasis added). The Court answered that precise question in the negative, noting that although the parent and subsidiary had many of the same officers and directors, "courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary," *id.* at 69, 118 S.Ct. 1876 (other internal quotation marks omitted). Thus, liability under a statute that does not itself pierce the corporate veil may not be imposed on a parent corporation for the acts of its subsidiary corporation based solely on the parent's 100% ownership of the subsidiary and active participation in or control of the subsidiary's board of directors. *See id.* at 68, 118 S.Ct. 1876. The Court pointed out, however, that "a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility." *Id.* at 55, 118 S.Ct. 1876. "[A] parent can be held directly liable when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture." *Id.* at 71, 118 S.Ct. 1876.

Several of these cases were synthesized in *Lone Star Steel Co. v. McGee,* 380 F.2d 640, 646–48 (5th Cir.), *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967), in which the Fifth Circuit considered whether Lone Star, a steel company, was a common carrier by railroad within the meaning of FELA and the Safety Appliance Act. Lone Star did not dispute that it was a carrier by rail; it had a rail line within its plant area and handled incoming shipments for other companies that had facilities on its property. But it contended that it was not a "common" carrier, given that it made no direct charge by way of tariffs and received no direct freight revenues for any of its rail services. However, Lone Star was virtually the sole stockholder of T & N, a railroad company that concededly was a common carrier. T & N, in addition to charging for its own services, charged for the rail services performed by Lone Star; and in a recent 10–year period, T & N had paid Lone Star $2 million in dividends.

After reviewing the circumstances and analyses in cases such as *State of California,* 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567, *Brooklyn Eastern District Terminal,* 249 U.S. 296, 39 S.Ct. 283, 63 L.Ed. 613, *Union Stock Yard & Transit,* 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226, and *Southern Pacific Terminal,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310, the *Lone Star* court found four considerations to be

> of prime importance in determining whether a particular entity is a common carrier. First—actual performance of rail service, second—the service being performed is part of the total rail service contracted for by a member of the public, third—the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public, and fourth—remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad.

380 F.2d at 647. Applying those criteria to the circumstances before it, the court concluded that Lone Star was a common carrier:

> Unquestionably, Lone Star performs rail services and such services are a part of the total rail transportation contract-

ed for and required by the industries located on its plant site. While it does not perform these services under contract with T & N, it certainly is an integral part of the T & N system of interstate rail transportation. And finally, even though it does not receive money in the form of direct transportation charges from T & N or from the industries serviced, it is for all practical purposes the sole owner of T & N. It is closely allied with T & N, their operations are interwoven, and therefore it receives in the form of dividends a part of the rate charged the industries by T & N. It has been suggested that we cannot ignore the legal individuality of Lone Star and T & N and therefore, we are precluded from attaching any significance to the fact that Lone Star is essentially the sole stockholder of T & N and consequently receives dividends therefrom. It is contended that stock ownership does not make the two companies one. While we agree with this proposition, we do not think it is controlling because the record does not present a case of mere stock ownership. Instead the record reflects that the operations of the two are highly integrated and mutually dependent.

*Id.* at 647–48. The court concluded that

[i]n light of the rail services Lone Star has performed, the fact that such services are actually rendered in fulfillment of T & N's obligations as a carrier, and giving consideration to the facts disclosed in the record revealing the close connection between the two companies and their mutual dependence on each other, ... both Lone Star and T & N are operating, jointly, a railroad system which constitutes each of them a common carrier.

*Id.* at 648–49.

■ In sum, the above cases reveal that companies that have no corporate af-filiation or agency relationship with a railroad and merely supply the railroad with equipment such as refrigeration cars, or merely use the railroads to provide services such as courier deliveries for third persons, are not "carriers" within the meaning of FELA. *See, e.g., Edwards v. Pacific Fruit Express Co.,* 390 U.S. at 540, 88 S.Ct. 1239; *Wells Fargo v. Taylor,* 254 U.S. at 187–88, 41 S.Ct. 93. On the other hand, companies in nonrailroad businesses that have rail lines and provide rail carriage ancillary to those businesses are "common" carriers by rail when they constitute necessary links to railroads that are common carriers. *See, e.g., State of California,* 297 U.S. at 182–83, 56 S.Ct. 421; *Brooklyn Eastern District Terminal,* 249 U.S. at 305–07, 39 S.Ct. 283; *Lone Star Steel Co. v. McGee,* 380 F.2d at 647–49. Further, a company that has neither its own rolling stock nor corporate stock in railroad companies may be considered a "railroad" if it is part of an integrated corporate family that includes common carriers by railroad and if it constitutes a necessary link to those carriers. *See, e.g., Southern Pacific Terminal,* 219 U.S. at 521–24, 31 S.Ct. 279; *see also Union Stock Yard & Transit,* 226 U.S. at 303–06, 33 S.Ct. 83. Even the fact that a company "conducts [such] operations, not as an integral part of a single railroad system but wholly as an agent for one or several," does not exempt it from the status of common carrier. *Brooklyn Eastern District Terminal,* 249 U.S. at 305, 39 S.Ct. 283. And while corporate ownership of a subsidiary and overlapping offices and directorates are not, without more, sufficient to impose liability on the parent for conduct of the subsidiary under a statute that does not itself pierce the corporate veil, the parent may nonetheless be liable for operations of the subsidiary in which the parent itself, wearing its parenting hat,

participates. *See, e.g., Bestfoods*, 524 U.S. at 55, 68–71, 118 S.Ct. 1876.

■ Bearing in mind the above principles and MTA's acknowledgement that LIRR is an interstate common carrier by railroad, and focusing on FELA's definition of "common carrier," which "include[s] ... corporations charged with the duty of the management and operation of the business of a common carrier," 45 U.S.C. § 57, we turn to the question of whether MTA is within the scope of FELA as a manager or operator of LIRR's business.

**B.** *MTA's Participation in LIRR's Business*

The Public Authorities Law imposes on MTA the responsibility for

> the continuance, further development and improvement of commuter transportation and other services related thereto within the metropolitan commuter transportation district, *including but not limited to such transportation by railroad.*

N.Y. Pub. Auth. L. § 1264(1) (emphasis added). To that end, MTA is given special powers, including the power to "acquire ... any transportation facility," *id.* § 1266(1); to "operate, maintain, renovate, improve ... or repair" such a facility, *id.* § 1266(2); to "levy and collect ... fares ... and other fees," *id.* § 1266(3); and to establish schedules, standards of operation, and public safety rules and regulations as necessary for "use and operation of any transportation facility," *id.* § 1266(4). MTA is authorized to "cause any one or more of its powers ... to be exercised or performed by[ ] one or more wholly owned subsidiary corporations," *id.* § 1266(5); it may "transfer to or from" such a subsidiary "any moneys, real property, or other property," *id.;* and it may apply for government grants "to meet capital or operating expenses" for such a subsidiary. *id.* § 1266(6). The "[A]uthority

may lease railroad cars for use in its passenger service...." *Id.* § 1266(7).

For the rail, bus, subway, bridge, tunnel, marine, and air operations "within the metropolitan commuter transportation district," MTA is "to develop and implement a unified mass transportation policy." *Id.* § 1264(1). In accordance with its legislative mandate, MTA encompasses, as subsidiaries or as components for which MTA is financially accountable, many transportation agencies, including Metro–North, the New York City Transit Authority, the Staten Island Rapid Transit Operating Authority, the Metropolitan Suburban Bus Authority, and the Triborough Bridge and Tunnel Authority. (*See* MTA 1997 Annual Report, Notes to Combined Financial Statements, at 63.) MTA provides centralized services to these agencies, in the areas discussed below with respect to LIRR.

In 1966, MTA acquired LIRR as a subsidiary. The board of directors of MTA is also the board of directors of LIRR, *see id.* § 1266(5), and the MTA chairman determines who will be president of LIRR. MTA is not, however, simply a holding company or a stockholder content to manage LIRR through overlapping formal corporate governance. Rather, the record reveals that MTA, using nonoverlapping personnel employed at its own headquarters ("MTAHQ"), participates directly and extensively in, *inter alia,* the financial side of LIRR's operations. MTA's 1997 Annual Report, for example, states that "Metropolitan Transportation Authority Headquarters ('MTAHQ') provides support in budget, cash management, finance, legal, real estate, treasury, risk management, and other areas, to ... [t]he Long Island Rail Road Company ('LIRR')...." (MTA 1997 Annual Report, Letter of Deputy Executive Director and Chief Financial Officer, at 50.)

MTA's Director of Labor Relations and head of human resources, Gary J. Dellaverson, described in his deposition several aspects of MTA's participation in the financial side of LIRR's operations. For example, MTA is involved in advertising and marketing for LIRR (Deposition of Gary J. Dellaverson ("Dellaverson Dep."), at 41, 64), and handles revenues generated by the placement of advertisements on LIRR property (*id.* at 41). MTA also participates directly in LIRR's budgeting, providing supervision with respect to cash management. "As cash management suggests," this means "managing cash flow of the entity." (*Id.* at 33.) Thus, "MTA headquarters' budgeting function for Long Island Railroad would and does both establish expenditure targets, make revenue projections and in conjunction with the Railroad, prepare annual budgets and periodic revisions." (*Id.* at 30). In sum, "MTA approves the Long Island Railroad's budget." (*Id.* at 31; *see also id.* at 32 ("I would say that [MTAHQ employees] probably assist in virtually every budgeting function and lead in the area that I described.").)

Further, MTA itself raises funds to subsidize LIRR operations. LIRR revenues generally do not rise to the level of its expenses. LIRR does not, however, borrow money or issue debt in its own name. (*See* Dellaverson Dep. at 35.) Rather, to subsidize LIRR operations, debt is issued by MTA, which pledges LIRR property as collateral. For example,

> MTA ... *Commuter Facilities Revenue Bonds* ... are obligations payable solely from, and secured by, a pledge of the gross operating revenues and the physical assets of LIRR and [Metro–North] for Commuter Facilities Revenue Bonds.... In accordance with the bond resolutions, sufficient funds to meet the maximum annual debt service requirements are held in reserve accounts

maintained by the trustee as security for payment of the bonds. The remaining revenues after debt service are available to meet the operating needs of the agencies.

(MTA 1993 Annual Report at 71.) Thus, the moneys raised for LIRR through the issuance of debt are administered by MTA; and MTA determines when portions of those funds will be made available to LIRR (*see* Dellaverson Dep. at 34). In sum, Dellaverson testified, it is fair to say that MTA looks at LIRR's income from passenger fares and vendor fees, determines the extent of the operational shortfall, and provides LIRR with the difference by way of subsidy. (*See id.* at 33–34.) Since LIRR "is not a self-sustaining enterprise" (*id.*), LIRR could not remain in the commuter railroad business in the absence of subsidies such as those provided by MTA.

In addition, "[c]ertain common functions between the operating agencies are provided by [MTA] headquarters." (*Id.* at 35.) These include legal matters with respect to LIRR real estate (*id.*); and some of those transactions on their face reveal the intertwining of MTA in the business of LIRR. For example, MTA's 1997 Annual Report described one $300,000–odd real estate transaction, in pertinent part, as follows:

> On March 31, 1997, MTAHQ entered into a lease/leaseback transaction with a third party whereby MTAHQ leased LIRR's Hillside maintenance facility.... The facility was subsequently subleased back to MTAHQ as a capital lease, and sub-subleased by MTAHQ to LIRR. The facility is included in LIRR's financial statements....

(MTA 1997 Annual Report at 80.)

Further, MTA is directly involved in LIRR's negotiations with labor unions. Dellaverson, employed at MTAHQ, is di-

rector of labor relations for MTA, has "responsibility for labor policy at the corporate level," and is the "chief labor negotiator for the Authority." (Dellaverson Dep. at 6). "[A]s part of [his] duties as director of labor relations for MTA" (*id.* at 14), Dellaverson normally had discussions with labor leaders with respect to anticipated collective bargaining agreements of LIRR (*see id.* at 15). He personally participated in negotiating, or at least was consulted and gave advice on, the majority of the major labor contracts entered into by LIRR. (*See id.* at 15–16.)

MTA's integral role in the business side of LIRR operations is amply reflected in MTA's own public statements. The MTA Annual Report for 1993, for example, described what MTA referred to as its "Fare Deal":

> Fare Deal is a vision of public transportation's possibilities—a business strategy that will change the relationship between the MTA and its customers in order to increase ridership and pay for improvement in our facilities and rolling stock.

(MTA 1993 Annual Report, Letter of MTA Chairman and Chief Executive Officer; *see Webster's New International Dictionary* 2163 (2d ed. 1957) (defining "rolling stock" as "[t]he locomotives, motorcars, passenger cars (or coaches), freight cars ..., and all other wheeled vehicles, etc., running or capable of running on the tracks or rails.").) The 1993 report stated that

> [t]he MTA delivered on Fare Deal throughout 1993. We found out what our customers wanted and gave it to them whenever and wherever we could
>
> We revised policies. A previous-month's commuter rail ticket can now be used on the first workday of the next month, showing regular customers we trust them and value their business....

> .... And we gave suburban rail customers more vans and small buses to take them from their homes to the station.

(MTA 1993 Annual Report, Letter of MTA Chairman and Chief Executive Officer.) The report also described, *inter alia,* MTA capital projects for the improvement of LIRR facilities:

**Fare Deal Means Infrastructure**

> .... In the transportation business, there is no standing still when it comes to maintaining infrastructure—you either move forward or slide backward.
>
> ....
>
> Capital projects on the railroads included four completions in the LIRR's huge, multiyear project to rebuild its portion of Penn Station as a customer-friendly facility: a ticket-holders' waiting room, central corridor, vaulted concourse ceiling, and LIRR Police office.

(MTA 1993 Annual Report at 11.) Again referring to these refurbishments, MTA stated

**Fare Deal Is Infrastructure**

> One of Fare Deal's pillars is dedicated to maintaining infrastructure, and 1993 saw work on several major LIRR projects[, including] a new and more visible LIRR Police office.
>
> . . . . .
>
> Building of another sort took place at our freight operation, which became a success story in 1993. The LIRR has been making tremendous efforts to move freight around the island.... As a result, freight contributed a significant positive cash flow for the first time in decades.
>
> Fare Deal's focus on customers was basic to everything the LIRR did in 1993—whether it involved infrastructure, safety, freight, mechanical reliability, on-time performance, or inter-modal

travel. Finding ways to satisfy all kinds of customer needs was the reason for the success of the MTA Long Island Rail Road during the year. (*Id.* at 22.) MTA stated that "[t]he Fare Deal promise of seamless travel moved closer to realization on Long Island." (*Id.* at 23.) In October 1998, MTA published an "ingenious" map entitled "MTA Railroads," which "placed the railroads on the backside of a subway map with [points of] intermodal transfer [e.g., from subway to train] ... being highlighted." (Dellaverson Dep. at 62–63.)

Finally, in addition to its hands-on participation in the budgeting, capital raising, marketing, advertising, real estate, risk management, and labor relations aspects of LIRR operations—and of particular relevance to the present case—MTA participates in LIRR's operations by providing security personnel for LIRR station parking lots. Although MTA argued in the district court that MTA police officers are not engaged in the "actual performance of rail service" by LIRR (MTA's Memorandum of Law in Support of Motion for Reconsideration at 9), there can be no question that the work of the MTAPD Auto Crime Unit at LIRR parking lots, to which Greene was assigned, is in "furtherance of" LIRR's railroad business within the meaning of FELA, 45 U.S.C. § 51. Commuters who drive to LIRR stations require safe places in which to leave their cars, and the presence of such police officers is meant to provide both security and reassurance:

> [A]ll the MTA police forces were targeting their customers' fears: the LIRR Police successfully thwarted car theft in railroad parking lots....

(MTA 1994 Annual Report at 8).

Further, it is clear that prior to the consolidation, the LIRR police officers were covered by FELA. (*See* Dellaverson Dep. at 83.) Indeed, Dellaverson testified that one of the benefits that MTA perceived it would receive as a result of the consolidation of the security forces as employees of MTAHQ was "having the workers out from under the FELA system." (*Id.* at 84; *see also* Supplemental Affidavit of Gary J. Dellaverson dated June 1, 2000, ¶ 2 (denying that removal of the LIRR police force from the coverage of FELA was "the purpose" of the consolidation, though it "was well understood to be one of the many results").)

And with respect to MTA's consolidated police force, as with respect to other financial, personnel, and asset-management matters such as those described above, the record reveals an intermingling of MTA and LIRR functions. Although employed by MTA, the officers use LIRR vehicles. And while the salaries of MTA policemen who were formerly LIRR employees are funded by MTA, "[t]he physical creation of the check itself" is done by the "Long Island Railroad Treasury Department for the employees up to the rank of captain." (Dellaverson Dep. at 101.)

In sum, MTA's relationship to LIRR is not limited to its status as stockholder of a subsidiary. While LIRR's own employees are responsible for running the trains and collecting the fares, there is more to "the management and operation of the business," 45 U.S.C. § 51, of a railroad than operation of the transportation facilities themselves. MTA, as described above, is directly and integrally involved in essential business aspects of LIRR operations, as well as in providing police services that are directly in furtherance as LIRR's business as a railroad. MTA has not called to our attention any case, and we are aware of none, in which a company so integrally involved in the essential business aspects of the railroad's operations, and was the employer of the person injured in the

course of employment that was designed to advance the railroad's business, was ruled not an employer within the meaning of FELA.

## CONCLUSION

The district court correctly ruled that, with respect to the police officers whom MTA employs to provide security for LIRR railroad parking lots, MTA "operates" an "interstate common carrier by railroad" within the meaning of FELA. We have considered all of MTA's arguments for the contrary conclusion and have found them unpersuasive. We of course express no view as to whether Greene was injured by reason of negligence on the part of any MTA officers, agents, or employees, or by reason of any defect or insufficiency, due to MTA's negligence, in its equipment.

The order of the district court denying MTA's motion for partial summary judgment dismissing Greene's FELA claims against MTA is affirmed.