Danny O'BRIEN and Cindra O'Brien, Appellants–Plaintiffs,

v.

WATCO CONTRACT SWITCHING, INC., a Kansas Corporation, a/k/a and/or d/b/a Watco Switching Services, Inc., Watco, Inc., a/k/a Watco, Inc., a/k/a Watco Indiana a/k/a Watco Switching, Appellee–Defendant.

No. 49A05–0303–CV–131.

Court of Appeals of Indiana.

Feb. 10, 2004.

Transfer Denied May 21, 2004.

5.   The presence of methamphetamine in Wire-

man's trailer was not in dispute in this case.

Karl G. Popowics, Lia R. Lukaart, Goodin Abernathy & Miller, Indianapolis, IN, Attorneys for Appellants.

Geoffrey L. Blazi, Nicholas C. Nizamoff, Stuart & Branigin, Lafayette, IN, Attorneys for Appellee.

## OPINION

SHARPNACK, Judge.

Danny O'Brien and Cindra O'Brien appeal the trial court's grant of summary judgment in favor of Watco, Incorporated ("Watco").[1] The O'Briens raise two issues, which we consolidate and restate as whether the trial court abused its discretion by granting Watco's motion for summary judgment.[2] We affirm.

The relevant facts follow. Danny O'Brien was employed by Watco as an operations manager. Watco's business includes "repair of certain rolling stock for various railroads and intra-company switching operations for several contracting industries." Appellant's Appendix at 102. "The switching operations were performed on trackage owned or leased by the contracting industries." *Id.* In November 1997, Watco was performing railroad switching services for National Starch and Chemical Company ("National Starch"). National Starch operates a starch manufacturing facility in Indianapolis, Indiana. The parties entered into a Switching Services Agreement, which provided, in relevant part, that:

> 2.4 [Watco] shall pick-up all inbound cars delivered by [Conrail] to the receive track/tracks designated by National and move these cars as prescribed by [National Starch's] designated representatives within the facility.
>
> 2.5 [Watco] shall pick up all outbound cars within the Facility and move them to the outbound track/tracks designated by [National Starch].
>
> * * * * *
>
> 2.7 [Watco] shall provide all intra-facility switching as instructed by [National Starch's] designated representatives.

*Id.* at 105–106. The Agreement described Watco as an independent contractor. All switching services performed by Watco for National Starch "were performed on trackage owned by, leased to, or licensed to National Starch" at National Starch's plant facility. *Id.* at 102. In November 1997, the National Starch facility contained approximately eighteen tracks and five warehouses. The facility is divided into two sections, the "Drover" section and the "Raymond" section. *Id.* at 138–139. In order to travel from one section of the National Starch facility to the other, Watco employees had to move equipment over

---

1. The O'Briens argue that they "expressly reserve the right to object to the assertion that 'Watco, Inc.,' is the proper name of the Watco group of Defendants." Appellant's Brief at 2 n. 1. However, "a party may not present an argument or issue to an appellant court unless the party raised that argument or issue to the trial court." *GKC Ind. Theatres, Inc. v. Elk Retail Investors, LLC*, 764 N.E.2d 647, 651 (Ind.Ct.App.2002). The O'Briens failed to make this argument to the trial court and have therefore waived this issue on appeal.

2. The O'Briens also argue that the materials that Watco designated to the trial court in support of its motion for summary judgment failed to establish a complete absence of material fact and, therefore, failed to shift the burden to the O'Briens to designate specific facts establishing a genuine issue for trial. Because we hold that the trial court did not abuse its discretion by granting Watco's motion for summary judgment, we need not address this issue.

Conrail's tracks. Each time Watco employees traveled over Conrail's tracks, they were required to get permission from Conrail. Watco's charges to National Starch were based upon "man hours for switching services." *Id.* at 102. On November 26, 1997, a railroad car struck O'Brien during the course of his employment with Watco, and he sustained severe personal injuries.

In November 1997, Charles Webb owned 100% of Watco. Charles Webb has two children, Richard Webb and Susan Webb. Watco operated ten companies that were owned by Charles, Richard, and Susan either individually or collectively in some capacity. All of the companies were involved in the railroad industry in some fashion.

On November 18, 1999, O'Brien and his wife, Cindra, filed a complaint against Watco to recover damages for O'Brien's injuries under the Federal Employer's Liability Act, 45 U.S.C. §§ 51–60 ("FELA"). On August 31, 2001, Watco filed a motion for summary judgment, alleging that the "undisputed material facts of this case demonstrate that Watco is an intra-plant switching service, not a common carrier subject to [FELA]. Thus, Plaintiffs' FELA claims against Watco fail as a matter of law, and summary judgment in Watco's favor should be granted." *Id.* at 96. The trial court granted Watco's motion for summary judgment, finding that Watco "is not a common carrier by railroad as required in order [for it to be subject to] an action under [FELA], 45 U.S.C § 51." *Id.* at 22.

■ The sole issue is whether the trial court abused its discretion by granting Watco's motion for summary judgment. The O'Briens suggest that our review of this matter is a mixed question of fact and law; however, the O'Briens also acknowledge "there is absolutely no dispute between the parties that [Watco] performs rail services for compensation in switching and moving railcars." Appellant's Brief at 22. Likewise, Watco notes that "[p]ursuant to the Switching Services Agreement between Watco and National Starch, Watco provided intra-plant switching services for National Starch, moving rail cars in and around National Starch's Indianapolis facility as instructed by National Starch representatives." Appellee's Brief at 3. Because the parties agree about the extent of Watco's specific operations at National Starch, there is no genuine issue of material fact. Rather, we must consider whether, as a matter of law, Watco's specific operations at National Starch make it a common carrier by railroad that is subject to liability under FELA.

■ When reviewing a trial court's decision to grant or deny summary judgment, we apply the same standard as the trial court. Accordingly, we must decide whether there is a genuine issue of material fact that precludes summary judgment and whether the moving party is entitled to judgment as a matter of law. *Carie v. PSI Energy, Inc.*, 715 N.E.2d 853, 855 (Ind.1999). When material facts are not in dispute, as is the case here, our review is limited to determining whether the trial court correctly applied the law to the undisputed facts. *Burkett v. Am. Family Ins. Group*, 737 N.E.2d 447, 452 (Ind.Ct. App.2000). We review such pure questions of law de novo. *Id.*

■ Congress enacted FELA in response to the "special needs of railroad workers who are exposed to daily risks inherent in their work." *Iverson v. S. Minn. Beet Sugar Coop.*, 62 F.3d 259, 261 (8th Cir.1995). FELA "imposes broad liability on railroads to provide compensation for on-the-job injuries sustained by their employees, but its application is explicitly

limited to railroads that function as common carriers." *Id.* FELA provides, in part, that:

Every *common carrier* by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories, or between the District of Columbia or any of the States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51 (emphasis added); *see generally Baltimore and Ohio R.R. Co. v. Taylor,* 589 N.E.2d 267, 271 (Ind.Ct.App. 1992) (discussing negligence action brought under FELA).

■ 45 U.S.C. § 57 provides that "[t]he term 'common carrier' as used in this chapter shall include the receiver or receivers or other persons or corporations charged with the duty of the management and operation of the business of a common carrier." The Supreme Court of the United States has also defined the term and held that "the words 'common carrier by railroad,' as used in [FELA], mean one who operates a railroad as a means of carrying for the public—that is to say, a railroad company acting as a common carrier." *Wells Fargo Co. v. Taylor,* 254 U.S. 175, 188, 41 S.Ct. 93, 98, 65 L.Ed. 205 (1920). Moreover, "[w]hether a transportation agency is a common carrier depends not upon its corporate character or de-

clared purposes, but upon what it does." *Lone Star Steel Co. v. McGee,* 380 F.2d 640, 648 (5th Cir. 1967) (quoting *United States v. California,* 297 U.S. 175, 181, 56 S.Ct. 421, 422, 80 L.Ed. 567 (1936)).

In *Greene v. Long Island R.R. Co.,* 280 F.3d 224, 226 (2nd Cir.2002), *cert. denied sub nom Metro Transp. Auth. v. Greene,* 538 U.S. 1031, 123 S.Ct. 2073, 155 L.Ed.2d 1060 (2003), the Second Circuit addressed the issue of corporate form versus actual operations in the context of defining a common carrier. Specifically, the circuit court addressed whether the Metropolitan Transportation Authority ("MTA") was a common carrier for purposes of FELA. *Id.* at 229. In 1996, MTA acquired the Long Island Railroad Company ("LIRR") as a subsidiary, and, until 1998, LIRR maintained its own police force to conduct surveillance at its parking lots and railroad stations. *Id.* at 227, 236. Greene was employed by LIRR from 1991 through December 1997. *Id.* at 227. In 1997, MTA became authorized to maintain a police department, and on January 1, 1998, all LIRR police officers, including Greene, became MTA employees. *Id.* Green was subsequently injured during the course of his employment by MTA and brought an action against MTA and LIRR to recover damages under FELA. *Id.*

■ MTA and LIRR moved for partial summary judgment. *Id.* At the time of Greene's accident, MTA was involved in LIRR's budgeting, capital raising, marketing, advertising, real estate, risk management, and labor relations. *Id.* at 239. MTA also provided security personnel for LIRR station parking lots. *Id.* MTA argued that its relationship with LIRR consisted merely of "indirect support functioning." *Id.* at 227. The district court disagreed and denied MTA's motion for summary judgment. *Id.* at 228. Specifically, the district court found that "it is not the corporate form of the entity that is dispositive" in "determining whether a de-

fendant is a common carrier." *Id.* The district court added that::

[B]y virtue of [MTA's] extensive involvement in LIRR's activities, MTA "operates" a common carrier according to the plain meaning of that word, and that suit against MTA under FELA is permissible because Greene "is no less employed by a common carrier today than when he performed the same duties when employed by LIRR."

*Id.* at 228–229. The Second Circuit agreed, holding that:

MTAs relationship to LIRR is not limited to its status as stockholder of a subsidiary. While LIRRs own employees are responsible for running the trains and collecting the fares, there is more to the management and operation of the business, 45 U.S.C. 51, of a railroad than operation of the transportation facilities themselves. MTA ... is directly and integrally involved in essential business aspects of LIRR operations, as well as in providing police services that are directly in furtherance as LIRRs business as a railroad.

*Id.* at 239. Accordingly, when determining whether an entity is a common carrier for purposes of FELA, we look not to the corporate form of the entity, but rather to its specific operation. Here, we look to Watcos specific operation at the National Starch plant facility.

The O'Briens argue that the trial court erred by holding that Watco is not a common carrier by railroad that is subject to liability under FELA with respect to its specific operation at National Starch. Specifically, the O'Briens argue that this matter is factually similar to the matter addressed by the Fifth Circuit in *Lone Star Steel Co. v. McGee,* 380 F.2d 640, 643 (5th Cir.1967), *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967). The O'Briens also suggest that *Kieronski v.*

*Wyandotte Terminal R.R., Co.,* 806 F.2d 107 (6th Cir.1986), is instructive.

In *Lone Star Steel Co. v. McGee,* Lone Star operated a plant near Lone Star, Texas where it processed and produced steel and steel products from raw materials. *Id.* at 642. Other industries also had operations on Lone Star's plant grounds, including Texas and Northern Railway Company ("T & N"), a common carrier. *Id.* Lone Star owned 3,308 shares of the 3,313 shares of the common capital stock issued by T & N. *Id.* Lone Star "performe[d] rail services between its classification yard and various locations within its plant which T & N[was] obligated to perform." *Id.* at 644. Further:

Lone Star [made] no direct charge by way of tariffs and receive[d] no direct freight revenues for any rail services performed by it, and publishe[d] no tariffs regarding rail movements. However, T & N's freight charges include a charge for the rail services involved in picking up and delivering cars to a particular industry, as mentioned above, and this charge is made regardless of whether T & N handle[d] the entire rail movement or Lone Star handle[d] a portion of such movement.

*Id.* at 643.

McGee, who was employed by Lone Star as a railroad switchman, was injured during the course of his employment. *Id.* at 641. McGee brought a complaint against Lone Star to recover damages for personal injuries under FELA. *Id.* at 641. The district court in a pre-trial order held that Lone Star was a common carrier by rail. *Id.* On appeal, the circuit court addressed whether the district court erred by holding as a matter of law that Lone Star was a common carrier by rail and, thus, subject to FELA. *Id.* at 642. The circuit court defined a common carrier as:

[O]ne who holds himself out to the public as engaged in the business of transportation of person or property from place to place for compensation, offering his services to the public generally. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant.

*Id.* at 643. In discussing the distinction between plant facilities and common carriers, the circuit court noted that where an industry maintains a complicated intraplant railroad system, such rail operations will be regarded as plant facilities rather than those of a common carrier. The movement of freight within the plant is not common carriage but rather industrial plant usage. *Id.* at 644; *see also New York Cent. H.R.R. Co. v. General Elec. Co.,* 219 N.Y. 227, 114 N.E. 115 (1916), *cert. denied* 243 U.S. 636, 37 S.Ct. 400, 61 L.Ed. 941 (1917). *Id.* at 654. The circuit court also identified a non-exclusive list of four considerations that were of prime importance when determining whether an entity is a common carrier.

*First*—actual performance of rail service, *second*—the service being performed is part of the total rail service contracted for by a member of the public, *third*—the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public, and *fourth*—remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad.

*Id.* at 647. The circuit court concluded that Lone Star was "regularly shuttling the goods of other business concerns located within its plant and thereby [was] performing a part of the total rail services which another railroad, T & N, ha[d] obligated itself to perform." *Id.* at 646. Because "T & N [held] itself out to the public as performing all the duties of a common carrier, Lone Star [could not] claim that the duties it perform[ed] for TN [were] not offered indiscriminately to the public." *Id.* Ultimately, the circuit court concluded that Lone Star had "gone beyond the permissible bounds of what is allowed in operating an intraplant rail system as a plant facility," and that "both Lone Star and T & N [were] operating, jointly, a railroad system which [constituted] each of them a common carrier." *Id.* at 648–649.

This matter is not, as the O'Briens suggest, similar to the matter addressed in *Lone Star.* There, Lone Star:

[B]y undertaking the obligations of a common carrier, T & N, . . . holds itself out to the public as being engaged in the business of public transportation. Moreover, since T & N holds itself out to the public as performing all the duties of a common carrier, Lone Star cannot claim that the duties it performs for T & N are not offered indiscriminately to the public.

*Id.* at 646. On the other hand, Watco has no such relationship with Conrail. Pursuant to the Agreement executed between Watco and National Starch, Watco is obligated to take cars that Conrail has delivered to the National Starch facility and move them to various locations within the plant and to take cars from various locations in the plant and move them to tracks that National Starch has designated for pickup by Conrail. The relationship between Watco and Conrail does not require Watco to perform rail services that Conrail is obligated to perform, as was the case in

*Lone Star.* Further, there is no ownership between Watco and Conrail.

There are other significant factual distinctions between *Lone Star* and the facts of this matter. In *Lone Star*, Lone Star owned the plant facility and hired T & N, a common carrier, to perform rail service on Lone Star's tracks at Lone Star's facility. Lone Star hired T & N to perform services that if performed by Lone Star would have made Lone Star a common carrier. Here, National Starch hired Watco, an independent contractor, to conduct rail switching on National Starch's tracks at National Starch's plant facility. Had National Starch performed the same services that it hired Watco to perform, National Starch would not be considered a common carrier. As such, Watco cannot be made a common carrier for performing the same services. Moreover, this matter is similar to the matter addressed in *Loveless v. Ry. Switching Servs., Inc.,* 106 Ohio App.3d 46, 665 N.E.2d 252, 255 (1995). There, the Ohio Court of Appeals held that Railway Switching Services, Inc. ("RSS") was not a common carrier for purposes of FELA. *Id.* at 255. RSS, like Watco, performed rail switching services for clients at the facilities of those clients. *Id.* at 253. The appeals court noted that:

> Quite clearly, RSS is not a common carrier. RSS manages in-plant rail operations for its clients, operating solely on the property of individual clients pursuant to separately negotiated contracts. RSS is not in any way affiliated with a full-service common carrier either contractually or by virtue of common ownership. Furthermore, RSS does not appear to transport people or property from place to place as required by FELA.

*Id.* at 255. The appeals court held that "no genuine controversy exists regarding the status of RSS. At most RSS is a private carrier, but could be more accurately described as an independent contractor performing in-plant rail operations for specific company-clients." *Id.* Likewise, here, with respect to Watco's specific operation at National Starch, it has no relationship with a common carrier "either contractually or by virtue of common ownership." *Id.* Moreover, as previously mentioned, Watco's operation at National Starch is best characterized as an independent contractor relationship whereby it performs in-plant rail switching operations for National Starch.

The O'Briens also argue that Watco is a common carrier based upon the Sixth Circuit's analysis in *Kieronski v. Wyandotte Terminal R.R., Co.,* 806 F.2d 107 (6th Cir.1986). There, Kieronski, an employee of Wyandotte, was injured during the course of his employment. *Id.* at 107. Kieronski brought a complaint against Wyandotte for compensation under FELA, and the district court dismissed the complaint because Wyandotte was not a common carrier within the meaning of FELA. *Id.* Specifically, the district court found that Wyandotte was not a common carrier because Wyandotte did not satisfy the third consideration of the analysis outlined by the Fifth Circuit in *Lone Star.*

The Sixth Circuit affirmed the district court's determination that Wyandotte was not a common carrier, but it did not directly rely upon the *Lone Star* analysis. Specifically, the circuit court noted that "we do not believe that the list of considerations should be applied as a *test* because it is, as the *Lone Star* court characterized it, only a list of *considerations* for a court to keep in mind when determining whether a carrier is a 'common carrier.'" *Id.* at 108 (emphasis in original). Rather, the circuit court held that carriers can be divided into several categories: (1) in-plant facility; (2) private carrier; (3) linking carrier; and (4)

common carrier by virtue of its relationship with a common carrier. *Id.* at 109. The circuit court noted that its selection of categories was not necessarily exhaustive. *Id.* at 109 n. 1. The circuit court held that Wyandotte was an in-plant facility and not a common carrier. Specifically, the circuit court concluded that:

> Wyandotte merely connected the plants to the common carriers in a manner typical of in-plant systems. Our conclusion is not weakened by Wyandottes right to use a portion of the track of the Detroit, Toledo Ironton Railroad, a common carrier, because those rights were merely for the convenience of the plants and in no way furthered the contractual obligations of the common carrier.... The system looks, at most, like a private carrier arrangement, with Wyandotte holding itself out solely to those businesses that owned facilities within the original two parcels, which does not lead us to characterize Wyandotte as a common carrier.

*Id.* at 109–110.

The O'Briens argue that Watco does not clearly fall into any of one of the categories identified in *Kieronski*, but that Watco is most like the carrier identified in the first and the fourth category, i.e. in-plant facility and common carrier by virtue of its relationship with a common carrier. The O'Briens add that Watco is more than an in-plant facility, because "[s]uch an in-plant facility is one that, generally, involves a company in a non-railroad business that transports goods by rail within its facility and that it does not provide such services to others or to the public ... [Watco] does not fit within this category as [Watco] is in the sole business of providing railway services to others." Appellant's Brief at 20. Watco argues that, like Wyandotte, it is also an in-plant facility.

We find *Kieronski* instructive. Like Wyandotte, Watcos specific operation at National Starch is also an in-plant rail facility and falls under the first of the circuit court's four categories. Watco is primarily responsible for taking cars that Conrail has delivered to National Starch and moving them to various locations within the plant and for taking cars from various locations within the facility and moving them to tracks that National Starch has designated for pick-up by Conrail. Watco merely connects National Starch to a common carrier, i.e., Conrail, in a manner consistent with in-plant systems. Further, as in *Kieronski*, our conclusion is not weakened because of Watco's right to use a portion of the track of Conrail, a common carrier, because "those rights were merely for the convenience of the plants and in no way furthered the contractual obligations of the common carrier." *Kieronski*, 806 F.2d at 109–110; *see also Loveless,* 665 N.E.2d at 255 (noting that the "mere fact that an in-plant system is connected to tracks owned or operated by a common carrier is not enough to bring the in-plant system within the scope of the FELA provisions, because virtually all in-plant operations share this characteristic").

The O'Briens also suggest that Watco's relationship with the other Watco companies makes Watco a common carrier for purposes of FELA. However, as previously mentioned, when determining whether an entity is a common carrier for purposes of FELA, we look to the specific operation in question, and here, we look to Watco's specific operation at National Starch. *See Greene,* 280 F.3d at 239. The fact that Watco is not a common carrier is not altered by the fact that Watco performs similar services in other parts of the country or by the fact that there is common ownership of Watco companies. Further, "corporate ownership of a subsidiary

and overlapping offices and directorates are not, without more, sufficient to impose liability on the parent for conduct of the subsidiary under a statute that does not itself pierce the corporate veil." *Greene v. Long Island R.R. Co.*, 280 F.3d 224, 235–236 (2nd Cir.2002). Although Watco is not a subsidiary, there is no designated evidence linking Watco's work for National Starch to the common carrier services of one or more of the Watco companies. Moreover, even though a company "may be considered a 'railroad' if it is part of an integrated corporate family that includes common carriers by railroad and if it constitutes a *necessary link* to those carriers," there is no "necessary link" here. *Id.* at 235 (emphasis added). Accordingly, the trial court did not err as a matter of law by holding that Watco is not a common carrier for purposes of FELA, and the trial court did not abuse its discretion by granting Watco's motion for summary judgment.[3]

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

MATHIAS, J. and VAIDIK, J., concur.

---

3. Watco argues that any claim that the O'Briens have under Indiana common law is barred by the exclusive remedy provision of the Indiana Workers Compensation Act. *See* Ind.Code § 22–3–2–6 (1998). Because we af-firm the trial court's grant of Watco's motion for summary judgment dismissing the O'Briens' FELA claim, we need not address this issue.