RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0002p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────

JOSEPH BRENT MATTINGLY,

*Plaintiff-Appellant*,

*v.*

R.J. CORMAN RAILROAD GROUP, LLC; R.J. CORMAN
RAILROAD SERVICES, LLC; R.J. CORMAN RAILROAD
COMPANY/MEMPHIS LINE aka R.J. Corman Railroad
Company/Memphis Line, Inc.,

*Defendants-Appellees*.

⎤
│
│
│
│
⎬  No. 22-5794
│
│
│
│
⎦

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:19-cv-00170—Joseph M. Hood, District Judge.

Argued: July 27, 2023

Decided and Filed: January 3, 2024

───────────────

**COUNSEL**

───────────────

**ARGUED:** Joseph H. Mattingly III, JOSEPH H. MATTINGLY III, PLLC, Lebanon, Kentucky,
for Appellant. James T. Blaine Lewis, MCBRAYER PLLC, Louisville, Kentucky, for Appellees.
**ON BRIEF:** Joseph H. Mattingly III, JOSEPH H. MATTINGLY III, PLLC, Lebanon, Kentucky,
William C. Robinson, Elizabeth Graves Coulter, MATTINGLY, SIMMS, ROBINSON &
MCCAIN, PLLC, Springfield, Kentucky, for Appellant. James T. Blaine Lewis, Shane O'Bryan,
MCBRAYER PLLC, Louisville, Kentucky, for Appellees.

───────────────

**OPINION**

───────────────

STEPHANIE D. DAVIS, Circuit Judge. While employed by R.J. Corman Railroad
Services, LLC ("Corman Services"), Plaintiff-Appellant Joseph Brent Mattingly sustained injuries

during the repair of a bridge owned and operated by a common carrier, Defendant-Appellee Memphis Line Railroad ("Memphis Line"). Mattingly filed suit to recover damages under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51. The district court determined that Mattingly was not employed by a common carrier—a prerequisite to trigger FELA liability—and granted Defendants' Motion for Summary Judgment. Mattingly challenges that ruling as well as the district court's entry of summary judgment before ruling on an important discovery dispute. Specifically, Mattingly faults the district court for not allowing individualized discovery as to Memphis Line after its late addition as a party. Because we conclude that Mattingly was not employed by a common carrier and is thus not entitled to FELA coverage, we AFFIRM.

I.

A.

Defendants in this case are individual members of a corporate family. Defendant R.J. Corman Railroad Group, LLC ("Corman Group") is the holding company for, and sole Member and Manager of, various subsidiary companies including Corman Services—a construction company that performs repair and construction work on railroad tracks and bridges throughout the country—and R.J. Corman Railroad Company, LLC ("Railroad Company"). Railroad Company, although not a party to this case, owns various short-line railroads, including Memphis Line.

In January 2017, Mattingly fell while performing bridge repair work on the Memphis Line and sustained several serious injuries, which ultimately led to the amputation of his left leg. At the time of the accident, Mattingly was nominally employed by Corman Services.

*Memphis Line Project.* Memphis Line retained Corman Services to repair the Red River Bridge and the Cumberland River Bridge (collectively, the "Memphis Line Project") in Clarksville, Tennessee. Mattingly supervised his own bridge repair crew solely comprised of Corman Services employees on the Memphis Line Project. Mattingly assigned crew members to equipment, assured that they had all necessary tools, and picked the spot they would work on each day. He reported to the superintendent, Paul Childres, another Corman Services employee who also supervised a separate crew of Corman Services bridge workers. Mattingly and Childres both reported to a Corman Services operations manager. Initially, the entire Corman Services team

reported to the Cumberland River Bridge, but Memphis Line later determined it would be more efficient to divide the workflow between the two bridges. Mattingly and his crew therefore switched to the Red River Bridge, and Childres and his crew remained at the Cumberland River Bridge approximately two miles away.

In addition to Corman Services employees, Railroad Company employees were involved in the Project. Jason Topolski, a Railroad Company bridge inspector who was on Memphis Line's payroll, was present at the job site. As bridge inspector, Topolski was responsible for ensuring the safety of Railroad Company bridges, which included ensuring the satisfactory maintenance and repair of those bridges. Cain Jones, another Railroad Company worker, was also present on the job site and served as its joint "Employee in Charge" alongside Topolski. Federal regulations mandate the appointment of an Employee in Charge on railway projects. *See* 49 C.F.R. §§ 214.317; 214.319; 214.353. The role involves ensuring railroad workers' safety on the tracks, including by communicating with dispatch to monitor train traffic passing through the job site and stopping work, if necessary, to allow the trains to pass.

Either Topolski or Jones was physically present onsite throughout the Memphis Line Project. At the outset of the Project, Memphis Line provided Corman Services with a list of bridge posts in need of repair, and Mattingly marked these posts. Mattingly and his crew worked to replace posts, caps, and cross braces on the bridge. At times, Memphis Line would adjust the priority or timing of repairs based on anticipated train traffic. Mattingly testified that Topolski would show employees how to complete discrete tasks, such as how to drill a hole. That said, Topolski mostly instructed the railroad's newer employees and generally stayed out of Mattingly's way since Mattingly was more familiar with bridge work than others.

Though Mattingly placed Topolski at the worksite "the whole time [Mattingly] was there," (R. 62-4, PageID 963), Topolski estimated that he was present at the Memphis Line Project site two to three days a week and not for the entire day. He admitted that he sometimes advised Corman Services' employees on certain matters and communicated with them about what the railroad needed done. Nevertheless, Topolski maintained that he did not supervise the Corman Services workers or otherwise tell the railroad crews what to do each day. He explained that if he did perform work on the Project, it would have been tasks outside of Corman Services' scope of work.

One of Mattingly's crew members, Dillon Neace, testified that Topolski may have been on the Cumberland River Bridge when the Memphis Line Project first started, but otherwise was not present at the job site.  Neace apparently did not view Topolski's directions as requirements to follow.  Rather, he stated that he would "probably listen" to Topolski if he told him to do something on the project because of Topolski's greater knowledge about bridge work and not due to his status. (R. 62-15, PageID 2048–49).  Neace also explained that if Jones asked him to do something pertaining to the Memphis Lines Project, he would first check with Mattingly and Childres. Michael Wilson, another member of Mattingly's crew at Red River, testified that he rarely saw Topolski or Jones.

At the start of every day, two safety meetings would take place on the Memphis Line Project—one typically led by Memphis Line regarding track protection, and one led separately by and for Corman Services employees.  As a supervisor, Mattingly was required to provide daily production reports to Memphis Line to apprise them of the project's progress.  This practice was common, regardless of whether Corman Services was working for a Corman Railroad Company railroad or for a non-Cormon-owned line.  At the time of Mattingly's accident, only Corman Services employees were present at the Red River Bridge; Jones was on the Cumberland River Bridge and Topolski was on a separate project out-of-state.  Mattingly testified that he was his own supervisor at that point in time.

*Corporate Organization.*  Corman Group provides administrative services to its subsidiary companies, including payroll, accounting, legal, human resources, information technology, public affairs, private aircraft services, risk management, purchasing, and commercial development.  It maintains several joint policies that apply to all its subsidiaries, including single workers' compensation; general liability insurance; automobile liability and life insurance policies; along with joint health insurance benefits and a single retirement plan.  It charges each individual company a monthly fee for its services.  Leaders of Corman Group's subsidiaries are considered senior staff and report directly to Corman Group's President, Ed Quinn.  Corman Group also created and memorialized Senior Staff Policies.  However, Corman Group maintains that they were "legacy documents," and that Quinn was unaware of their existence and did not adhere to the policies. (R. 79-2, PageID 3414, ¶¶ 15–16).  Corman Group also has developed safety protocols

applicable to all its subsidiaries and conducts annual mandatory safety trainings for all subsidiary employees. Further, Quinn approves the annual budget of each subsidiary as well as purchases over a certain amount.

Each of Corman Group's subsidiaries, including Corman Services, employs a president, a vice president, managers, and supervisors separate from Corman Group. Corman Services makes its own hiring, firing, promotion, and disciplinary decisions. It also independently manages its employees' schedules. Corman Services' largest customers include Class I railroads, as well as short line and regional railroads unaffiliated with the Railroad Company railroads. Railroad Company routinely solicits bids from other repair and construction companies, but frequently chooses Corman Services for work when availability permits. When Corman Services works on one of Railroad Company's railroads, including Memphis Line, it charges only the actual cost for labor and equipment, not the market rate. Undisputed testimony indicates that whether and for how long Corman Services remains on a Railroad Company job is directly related to whether Corman Services has any non-Corman work. The record also shows that Corman Services often left Railroad Company jobs before completion. In Topolski's experience, Corman Services prematurely pulled out of every Railroad Company job that had ever been assigned to it, without consequence.

B.

Mattingly filed a complaint in the United States District Court for the Eastern District of Kentucky, initially naming Corman Group and Corman Services as defendants. Mattingly sought compensation under FELA for his injuries and losses. The district court ordered phased discovery, allowing first for discovery on the threshold issue of FELA applicability. Once discovery and dispositive motions regarding the Act's applicability were complete, the court would set the second phase of discovery as needed. During phase I discovery, the magistrate judge denied Mattingly's request to obtain a copy of Corman Group's consolidated external audit report. Mattingly filed a motion for modification of the magistrate judge's order, which the magistrate judge denied. Mattingly filed objections to the magistrate's order that remained unresolved when summary judgment was issued.

As the case progressed, the court granted Mattingly's motion for leave to file a second amended complaint in which he sought to add Memphis Line as a defendant over Defendants' objections. Several months later, Memphis Line was added as a defendant in the Second Amended Complaint.

Discovery closed on the FELA applicability issue. Mattingly moved for partial summary judgment as to that issue, and Corman Group and Corman Services moved for summary judgment as to Mattingly's FELA claims. For his part, Mattingly asserted that under the "unitary theory," Corman Group operated its subsidiaries as an organized, unitary railroad system, rendering Corman Group and all of its subsidiaries—including Corman Services—common carriers for the purposes of FELA. Alternatively, he argued that he should be considered the employee of a common carrier for purposes of FELA based on common-law principles, as a subservant of a company (Corman Services) that was in turn acting as a servant of a common carrier (Corman Group and Memphis Line).

In August 2022, the district court determined that FELA does not apply to Mattingly's claim and granted Defendants' motion for summary judgment, including all claims against the later-added defendant, Memphis Line. It did so without ruling on Mattingly's pending discovery objections, and without reopening discovery to allow for a targeted inquiry as to Memphis Line. In granting summary judgment, the court reasoned that Mattingly's unitary theory for recovery was not supported by law, and that he had failed to present adequate evidence from which a rational jury could find that Memphis Line controlled, or had the right to control, Corman Services or Mattingly's daily work at the time of his injury under common-law principles. This appeal followed.

## II.

We review the district court's grant of summary judgment *de novo. See Kentucky v. Yellen*, 54 F.4th 325, 335 (6th Cir. 2022). In doing so, the court must view the facts in the light most favorable to Mattingly as the non-moving party and give him the benefit of all reasonable inferences arising from the record. *See LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022). Summary judgment is appropriate where the movant shows that there exists no genuine

dispute of material fact, and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. We review the district court's rulings regarding discovery under a highly deferential abuse-of-discretion standard. *See Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 515 (6th Cir. 2022).

III.

A.

*FELA Applicability*. Mattingly maintains that the district court erred in concluding that Corman Services is not a common carrier, and as such, FELA coverage does not extend to Mattingly. FELA provides the exclusive remedy for employees of common carriers by railroad to recover damages for injuries sustained during the course of employment. The statute provides that a common carrier by railroad engaging in commerce:

> shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery . . . or other equipment.

45 U.S.C. § 51. Relevant here, FELA applies only to (1) employees (2) of a common carrier by railroad.

On appeal, Mattingly advances the same two theories for FELA coverage that he did in the district court: unitary theory and subservant liability. But neither theory supports Mattingly's claim for recovery. We address each in turn.

**1. Unitary Theory**

Mattingly first asserts that Corman Group's ownership, management, and control over Corman Services and its common carrier subsidiaries makes Corman Services a member of a "unitary" railroad system and, consequently, a common carrier for purposes of FELA. This argument, however, essentially asks the court to disregard Defendants' corporate structure to hold Corman Group and its non-common carrier subsidiaries (including Corman Services) liable under FELA. This we cannot do.

The Supreme Court has interpreted FELA's use of "common carrier by railroad" to mean "one who operates a railroad as a means of carrying for the public—that is to say, a railroad company acting as a common carrier." *Wells Fargo & Co. v. Taylor*, 254 U.S. 175, 187 (1920). More recently, we have elaborated that a "common carrier" under FELA is:

> one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally.  The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public serv[a]nt.

*Kieronski v. Wyandotte Terminal R.R. Co.*, 806 F.2d 107, 109 (6th Cir. 1986) (citation omitted). FELA also includes in its definition of a common carrier, "persons or corporations charged with the duty of the management and operation of the business of a common carrier."  45 U.S.C. § 57.

Mattingly's unitary theory relies on two early-twentieth-century Supreme Court cases: *Southern Pacific Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498 (1911) and *United States v. Union Stockyards & Transit Co. of Chi.*, 226 U.S. 286 (1912).  In both cases, the Court weighed whether entities held in common ownership alongside common carriers might be deemed common carriers for purposes of the Interstate Commerce Act of 1887, Pub. L. No. 49-104, 24 Stat. 379, and whether they were within the jurisdiction of the Interstate Commerce Commission ("ICC"). These cases carry some limitations in the context of Mattingly's FELA claims, but they are useful in providing general principles for our analysis.  *See Kieronski*, 806 F.2d at 109 (examining *Southern Pac. Terminal Co.* and *Union Stockyards* applicability to FELA claims).

*Southern Pacific* appears to provide the Court's earliest guidance on the unitary theory.  In that case, the Supreme Court found that Southern Pacific Terminal ("SP Terminal")—a business entity owned by Southern Pacific Company, which in turn owned a group of individually incorporated railroads—was a common carrier.  *Id.* at 517.  SP Terminal was in the business of operating wharves and docks to accommodate the import and export of freight.  *Id.* at 502.  The wharves and docks themselves were connected to the railroad tracks of SP Terminal's sister companies.  *Id.* at 503.  The Court concluded that SP Terminal was a common carrier, in part, because of its ownership and operation, along with its sister companies, by a single corporation. In that regard, the Court noted the fact that Southern Pacific Company "control[led] . . . the

properties . . . through stock ownership." *Id.* at 521 ("There is a separation of the companies if we regard only their charters; there is a union of them if we regard their control and operation through the Southern Pacific Company."). Equally important, SP Terminal "form[ed] a link in the chain of transportation" for the respective companies. *Id.* at 522. That is to say, SP Terminal's wharves and docks were "*necessary* to complete the avenue through which move shipments over [the] lines owned by a single corporation," making SP Terminal a common carrier for purposes of ICC jurisdiction. *Id.* (emphasis added).

In *Union Stockyards*, the Court similarly found that the defendant, "Stock Yard Company," was a common carrier subject to the Interstate Commerce Act. 226 U.S. at 303. The Stock Yard Company was held by a parent company, and that parent company also held Junction Company—an owner and operator of railroads. *Id.* The Stock Yard Company operated facilities to load and care for livestock in their journey over Junction Company's rail lines. It also received two-thirds of Junction Company's profits. *Id.* at 300. Again, while the fact that Stock Yard Company and Junction Company shared a common owner was a relevant consideration in the Court's holding, the salient consideration was that Stock Yard Company's facilities and services provided a necessary physical link in the chain of interstate commerce. *Id.* at 304–05. Moreover, the character of the services rendered by Stock Yard Company were that of a common carrier because it "perform[ed] services as a railroad." *Id.* ("Together, these companies, as to freight which is being carried in interstate commerce, engage in transportation within the meaning of the act, and perform services as a railroad when they take the freight delivered at the stock yards, load it upon cars, and transport it for a substantial distance upon its journey in interstate commerce . . . or receive it while it is still in progress in interstate commerce.").

Here, Corman Services' bridge repair and construction services do not provide such an inextricable function for Memphis Line's common carrier services like the entities in *Southern Pacific Terminal* and *Union Stock Yard* did. Granted, the maintenance and repair of railroad tracks and bridges is surely integral to the operation of railroads. But maintenance is not a rail service contracted for by the public when it engages Memphis Line as a common carrier. In the leading cases, the plaintiffs functioned to actively keep things—freight and livestock respectively—moving in interstate commerce. In this case, Corman Services maintained the physical structure

of the railroad, but it was not an active participant in the chain of commerce itself. *See Union Stockyards*, 226 U.S. at 304 (emphasizing that the primary consideration is whether the "service to be performed was a part of the carriage of freight by railroad in interstate commerce") (citing *Southern Pacific*, 219 U.S. 498); *see also Kieronski*, 806 F.2d at 109 (understanding *Southern Pac. Terminal* and *Union Stockyards* to extend common carrier liability to "linking" entities that have "common ownership" with a railroad).

*Edwards v. Pacific Fruit Express Company* offers additional guidance. 390 U.S. 538 (1968). In *Edwards*, the Supreme Court addressed Congress's reluctance to expand the meaning of common carriers in its 1939 amendments to FELA. The Court observed that "[b]y refusing to broaden the meaning of railroads, Congress declined to extend the coverage of the Act to activities and facilities intimately associated with the business of common carrier by railroad." *Id.* at 541. While the *Edwards* Court weighed whether renting refrigerator cars to railroads and providing protective services in the transport of perishable commodities constituted the business of a common carrier, the Court's logic that, "while used in conjunction with railroads and closely related to railroading, are yet not railroading itself," applies with equal heft to Corman Services' construction and repair activities. *Id.* at 540.

Moreover, an age-old principle of corporate common-law "deeply 'ingrained in our economic and legal systems'" is useful to our analysis as well: "a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quoting William O. Douglas & Carrol M. Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193, 193 (1929)); *see also Schultz v. Gen. Elec. Healthcare Fin. Servs.*, 360 S.W.3d 171, 174 (Ky. 2012) ("General principles of corporate law, specifically with respect to piercing the corporate veil, have become axiomatic. For example, it is widely accepted that a corporation should be viewed as a separate legal entity."). Mattingly does not present circumstances warranting the disregard of Defendants' separate corporate structure.

For instance, in *Bestfoods*, the Supreme Court considered whether a parent corporation could be charged with derivative liability for its subsidiary's actions under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). In answering in the negative, the Court looked to the statute itself. It emphasized that CERCLA was notably silent on

"the liability implications of corporate ownership." *Id.* at 63. And the statute's silence "demand[ed] application of the rule that, to abrogate a common-law principle, a statute must speak directly to the question addressed by the common law." *Id.* (citing *United States v. Texas*, 507 U.S. 529, 534 (1993)). The Court's guidance in *Bestfoods* leads us down two paths—statutory and common law—both yielding the same result.

First, unlike CERCLA, FELA arguably does contemplate a circumstance in which courts may disregard separate corporate entities. *See* 45 U.S.C § 55. Section 55 voids "[a]ny contract, rule, regulation, or device whatsoever," with "the purpose or intent . . . to enable any common carrier to exempt itself from any liability created" by FELA. At least one of our sister circuits has interpreted the provisions of Section 55 to "encode[] the [corporate] 'domination' doctrine to the extent the FELA permits the use of this doctrine to pierce the corporate veil." *See Selser v. Pac. Motor Trucking Co.*, 770 F.2d 551, 554 (5th Cir. 1985). The Fifth Circuit in *Selser* addressed whether a common carrier parent company could be liable under FELA for its non-common carrier subsidiary. The court reasoned that "common law 'domination' is . . . relevant only to the extent to which it may evidence intent or purpose to exempt the parent [] from FELA liability." *Id.*; *see also Smith v. Rail Link, Inc.*, 697 F.3d 1304, 1309 (10th Cir. 2012) (noting in dicta that plaintiff "might succeed" in implicating the corporate parent of common carrier subsidiaries as a common carrier subsidiary itself "if she could show that this corporate structure was established as a means of evading FELA liability").

Citing *Petersen v. Ogden Union Ry. & Depot Co.*, 175 P.2d 744, 746 (Utah 1946), Mattingly maintains that Corman Group's organization has the *practical effect* of exempting some of its employees from FELA liability, providing sufficient grounds to fall within the ambit of § 55. But *Petersen*, a state court decision from Utah, appears to stand alone in its interpretation of the Act. We do not take such a liberal view of FELA's statutory language. This court's sister circuits—and the plain language of the statute—indicate that the purpose and intent, not the "practical effect," of the device in question is relevant to the analysis. *See Selser*, 770 F.2d at 554 ("By its terms, section 55 voids all devices, and only those devices, whose actual *purpose or intent* is to enable a carrier to exempt itself from liability.") (emphasis in original); *Smith*, 697 F.3d at 1409 ("[Plaintiff] might succeed if she could show that this corporate structure was established as

a means of evading FELA liability."). Mattingly points to no evidence that Corman Group designed its corporate structure with the purpose or intent to exempt itself from FELA liability. To the contrary, undisputed record testimony reflects numerous legitimate purposes for the corporate segregation of the companies, including their diverse functions, clientele, suppliers, and management requirements.

Mattingly fares no better if we instead apply corporate common-law principles as in *Bestfoods*. 524 U.S. at 63; *see also Willard v. Fairfield S. Co.*, 472 F.3d 817, 823 (11th Cir. 2006) (considering Alabama corporate law to determine whether a railroad "so control[led] the operation of [the plaintiff's nominal employer] as to make it a mere adjunct, instrumentality, or alter ego of" the railroad for purposes of FELA); *Greene v. Long Island R.R. Co.*, 280 F.3d 224, 235 (2d Cir. 2002) (similar). State law dictates whether circumstances exist warranting piercing the corporate veil. *See Longhi v. Animal & Plant Health Inspection Serv.*, 165 F.3d 1057, 1061 (6th Cir. 1999). "Under Kentucky law, separate corporate interests, including subsidiaries and affiliates . . . are separate legal entities and must be recognized and treated as such unless there is some reason to pierce the corporate veil." *Hazard Coal Corp. v. Ky. W. Va. Gas Co.*, 311 F.3d 733, 739 (6th Cir. 2002). And such reasons are found "only in the rarest of circumstances." *Schultz*, 360 S.W.3d at 174. Specifically, two elements must be met: "(1) domination of the corporation resulting in a loss of corporate separateness *and* (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *Howell Contractors, Inc. v. Berling*, 383 S.W.3d 465, 469 (Ky. Ct. App. 2012) (emphasis in original) (quoting *Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 165 (Ky. 2012)). Considerations going to the first factor include "grossly inadequate capitalization, egregious failure to observe legal formalities and disregard of distinctions between parent and subsidiary, and a high degree of control by the parent over the subsidiary's operations and decisions, particularly those of a day-to-day nature." *Inter-Tel Techs., Inc.*, 360 S.W.3d at 164. While Mattingly cites evidence that Corman Group exercised some degree of control over its subsidiaries, the evidence advanced does not warrant the exceptional measure of disregarding corporate formalities among the entities. The subsidiary Defendants managed their own daily operations and maintained corporate officers and personnel distinct from Corman Group; Mattingly presents no evidence that the subsidiary Defendants were not financially independent of Corman Group; and Services maintained substantial business

relationships beyond the Corman Group subsidiary railroads. Thus, a common law approach is no more effective here than a statutory one.

As such, Mattingly does not present a genuine dispute of material fact as to whether Corman Services may be considered a common carrier based on its relationship to Corman Group under FELA.

### 2. Subservant Theory

Mattingly next asserts that even if Corman Services cannot be considered a common carrier by virtue of Corman Group's operation, common-law employment principles still render him an employee of Memphis Line.

Under FELA, the words "employee" and "employed" are intended in their natural sense, established by proof of a master-servant relationship under traditional principles of common law. *Kelley v. S. Pac. Co.*, 419 U.S. 318, 323 (1974). A master-servant relationship under common law exists where "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." *Id.* at 324 (quoting Restatement (Second) of Agency § 220(1) (1958)).

The parties agree that the leading case on the matter is *Kelley*. There, the Supreme Court enumerated three approaches for a plaintiff seeking coverage under FELA to establish common law employment with a common carrier. *Id.* at 324. Mattingly chose to proceed under the "subservant" approach, which allows him to rely on evidence that he was acting as "a subservant of a company that was in turn a servant of the railroad." *Id.* To prevail under this approach, Mattingly must show that (1) Corman Services was a servant of Memphis Line, and (2) he was subject to the control of both Memphis Line and Corman Services.[1] Because we do not find that

---

[1]In his briefs before this court, Mattingly states that both Corman Group and Memphis Line were "masters" of Corman Services for purposes of the subservant theory. (Dkt. 22, Page 50). However, the substance of his argument focuses solely on Memphis Line's control over Services (*see id.* at 52–53; Dkt. 33, Page 21). We therefore address only the master-servant relationship between Memphis Line and Corman Services. *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019) ("[A] defendant forfeits an argument by . . . identifying it without pressing it.") (quoting *United States v. White*, 920 F.3d 1109, 1122–23 n.4 (6th Cir. 2019)). Although Mattingly's arguments are forfeited, Defendants directly and adequately addressed the issue in their response brief. (Dkt. 27, Page 53–54). With no counter to the defendant's well taken arguments, Mattingly cannot prevail on this issue.

Memphis Line controlled or had the right to control Corman Services' daily operations such as to establish a master-servant relationship, Mattingly's subservant theory of employment must fail.

The facts of *Kelley*—where the Supreme Court determined that the district court's findings did not establish a master-servant relationship between the plaintiff's nominal employer and a defendant railroad company—are helpful to our review.  The plaintiff was employed by a trucking company ("PMT") and sustained injuries while unloading vehicles from the defendant-railroad company's railcar to PMT's trailer.  *Id.* at 321.  PMT was a wholly owned subsidiary of the railroad company, and the plaintiff-employee claimed to be employed by the railroad company for purposes of FELA.  *Id.*  The district court found that the relationship between the plaintiff-employee and the railroad company established FELA liability.  *Id.*  The district court reasoned that because PMT was serving as an agent of the railroad, the railroad was ultimately "responsible" for the unloading operation; PMT employees were the railroad's agents for purposes of the unloading operation; and the work performed by the plaintiff fulfilled a nondelegable duty of the railroad.  *Id.* at 322.

The Court of Appeals for the Ninth Circuit reversed, finding the district court's test for FELA liability too broad; the Supreme Court agreed.  *Id.*  The Court reasoned that FELA liability requires more than an agency relationship, but that of a "master-servant" where the railroad must have "controlled or had the right to control the physical conduct of PMT employees in the course of their unloading operations."  *Id.* at 325.  It did not matter that railroad employees were responsible for checking safety conditions on the site—this only "reflect[ed] the fact that the activities of the two companies were closely related and necessarily had to be coordinated."  *Id.* at 326–27.  And despite railroad supervisory personnel being on site and occasionally advising or consulting with PMT employees and supervisors, the railroad did not play "a significant supervisory role in the unloading operations."  *Id.* at 327.  Further, "[t]he two companies were sufficiently distinct in organization and responsibility that there was no apparent overlap in the supervisory ranks."  *Id.*

Under facts similar to Mattingly's, we applied *Kelley*'s subservant theory to FELA claims in *Campbell v. BNSF Railway Company*, 600 F.3d 667 (6th Cir. 2010).  We found no master-servant relationship between the plaintiff's employer, Pacific Rail Services, LLC ("PRS"), and

BNSF Railway Company, with whom PRS contracted. *Id.* at 668. The plaintiff in *Campbell* was injured while driving a railroad transport vehicle at a railyard owned by BNSF. *Id.* BNSF employed one worker at the terminal: a hub manager who was charged with ensuring that PRS workers timely completed their assignments and followed BNSF's safety protocols. *Id.* at 669. The hub manager also discussed with PRS employees which tracks needed to be cleared and spotted, but PRS managers and supervisors were otherwise responsible for directing the specifics of PRS employees' activities, assigning containers to rail cars, and coordinating and tracking the work. *Id.* Further, BNSF had no authority to hire, train, evaluate, discipline, or terminate PRS employees. *Id.* at 673. PRS maintained substantial business relationships outside of its dealings with BNSF and had complete authority over its employees' schedules; PRS could also assign any number of workers to the BNSF terminal. *Id.* Taken together, the court found that "PRS controlled, and had the exclusive right to control, its employees as BNSF's independent contractor," and as such, the subservant theory failed. *Id.* at 674.

Similarly, Mattingly does not establish that Corman Services was a conventional common-law servant of Memphis Line. Corman Services employed its own supervisory personnel who were present at the job site each day. *See Kelley*, 419 U.S. at 327. Corman Services paid its workers from its own bank account. *See id.* at 328 (considering that a nominal employer "fixed and paid [workers'] wages"). Corman Services determined which and how many of its workers would show up at each job, including the Memphis Line Project. *See Campbell*, 600 F.3d at 673. Memphis Line had no authority to hire, fire, discipline, train, or evaluate Corman Services employees. *See id.* at 669. For example, Childres conducted Mattingly's employee evaluations, and Mattingly in turn conducted employee evaluations for his supervisees at Corman Services. Moreover, Corman Services had "substantial business relationships" outside of its dealings with Memphis Line. *Id.* at 673. In fact, these external business relationships apparently took precedence over its relationships with the Railroad Company railroads, as Corman Services often dropped Corman jobs if other work became available. Moreover, while the railroad defined the scope of the work on the Memphis Line Project—identifying which bridge posts required repair— Corman Services controlled its own day-to-day schedule. *See id.* at 669.

The relative roles of the companies are also relevant here. *See e.g., Kelley*, 419 U.S. at 326–27; *Standard Oil Co. v Anderson*, 212 U.S. 215, 226 (1909). Memphis Line retained responsibility for ensuring the safety of Corman Railroad bridges and the work site, while Corman Services was utilized to repair unsafe portions of the bridge. The *Standard Oil Company* decision is instructive here. In *Standard Oil Company*, the Court explained that a winchman obeying the signals of a gangman while timing the raising and lowering of cases of oil "showed co-operation rather than subordination" and "not the [taking] of orders, but of information." 212 U.S. at 216. Mattingly's version of the facts, viewed in the context of the functions of Memphis Line and Corman Services on the Memphis Line Project are also more indicative of cooperation than subordination, and "reflect the fact that the activities of the two companies were closely related and necessarily had to be coordinated." *Kelley*, 419 U.S. at 327; *see Standard Oil Co.*, 212 U.S. at 256 ("[W]hen one large general work is undertaken by different persons, doing distinct parts of the same undertaking, there must be co-operation and co-ordination, or there will be chaos."). And similar to *Kelley*, due to the nature of the work performed, the companies "naturally had substantial contact with one another." *Kelley*, 419 U.S. at 327. As such, the evidence demonstrates that Corman Services was not subjugated to the control or right to control of Memphis Line.

In resisting this result, Mattingly directs our attention to his testimony that Topolski was often present at the Project, and Topolski's testimony that he might offer advice to Corman Services bridge crew members regarding some tasks. But even resolving the conflicting facts in Mattingly's favor, Topolski's unilateral actions on the Project fall short of establishing Memphis Line's control over Corman Services. *See Kelley*, 419 U.S. at 330 ("The informal contacts between the two groups must assume a supervisory character before the [contractor's] employees can be deemed pro hac vice employees of the railroad."). Other testimony, including Mattingly's own, showed that Topolski's involvement on the Project did not take on a supervisory character. *See id.* at 327 (railroad personnel "advis[ing] or consult[ing] with [contractor] employees and supervisors" does not equate to a "significant supervisory role."). For example, Mattingly explained that while Topolski might instruct newer employees as to certain tasks, he and Topolski stayed out of each other's way because he was more familiar with bridge work. And one of Mattingly's subordinates on the Project, Mr. Neace, explained that he would "probably listen" to

Topolski due to his knowledge and experience, but not due to his status.  (R. 62-15, PageID 2048–49).

To the extent that Mattingly claims that Topolski "dictated the times when Corman Services employees could work," he also conceded that this was "in relation to when Corman trains needed to pass."  (Dkt. 22, Page 34).  Such coordination not only indicates "necessary cooperation" as opposed to a master-servant relationship, but it is also consistent with a railroad's federally mandated role in ensuring the safety of on-track workers under 49 C.F.R. §§ 214.317, 214.319, 214.353.  *See, e.g., Campbell*, 600 F.3d at 674 (explaining that a railroad's obligation to adhere to safety requirements does not demonstrate employment relationship); *Royal v. Mo. & N. Ark. R.R. Co., Inc.*, 857 F.3d 759, 763 (8th Cir. 2017) (same).  Similar reasoning applies to the requirement that Corman Services supervisors, including Mattingly, circulate daily production reports by e-mail to Railroad Company supervisors.  This practice permitted the railroad to keep track of the work being completed and comply with federal safety requirements.  Both Mattingly and Childres testified that this was a standard practice that they would complete for any railroad with whom Corman Services contracted.

Ultimately, Mattingly does not present a genuine dispute of material fact regarding whether Corman Services, as an entity, was merely a common-law servant to Memphis Line or whether Corman Group's operations established a unitary organization for FELA applicability.  Accordingly, we hold that the district court did not err in granting summary judgment to Defendants on Mattingly's FELA claim because Mattingly was not employed by a common carrier under the Act.

B.

*Discovery Issues*.  Lastly, Mattingly maintains that the district court failed to (1) order discovery as to Memphis Line once it was added as a party, and (2) resolve a pending discovery dispute.  Generally, summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery.  *See Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Mattingly's first claim lacks merit.  In June 2021, the parties filed dispositive motions. Memphis Line subsequently entered its appearance in December 2021.  In August 2022, the district court granted Defendants' motion for summary judgment on the FELA claim and included Memphis Line in the order and corresponding judgment.  There is no indication that Mattingly sought to initiate a discovery conference or sought additional discovery as to Memphis Line in the months following its addition as a party.  *See* Fed. R. Civ. P. 26(f)(2) ("The attorneys of record . . . that have appeared in the case are jointly responsible for arranging the [discovery] conference.").  Having failed to preserve the Memphis Line discovery dispute below, Mattingly cannot challenge it here.  *See Stemler v. City of Florence*, 126 F.3d 856, 866 n.9 (6th Cir. 1997). In any event, Mattingly cannot support his claim on appeal that he was not afforded a "sufficient opportunity" for discovery as to Memphis Line.  *See Vance*, *v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996.)

Mattingly's remaining claim of error is similarly without merit.  During discovery, the magistrate judge denied Mattingly's request to obtain a copy of Corman Group's consolidated external audit report, which he claims would reveal important aspects about the control that Corman Group exercised over its subsidiaries.  Mattingly filed a motion to modify the decision and the magistrate judge denied that motion.  Mattingly filed objections to the magistrate judge's order, but the district court never ruled on the objections.  The parties subsequently filed dispositive motions.

In the context of a motion for summary judgment, "[t]he non-movant bears the obligation to inform the district court of his need for discovery" by complying with Federal Rule of Civil Procedure 56(d).  *Id.* at 1148–49.  An affidavit pursuant to Rule 56(d) "must 'indicate to the district court [the non-movant's] need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information.'"  *Doe v. City of Memphis*, 928 F.3d 481, 490 (6th Cir. 2019) (quoting *Ball*, 385 F.3d at 720).  If a non-movant fails to comply with Rule 56(d), the issue of whether summary judgment was prematurely entered because additional discovery was required is not preserved for appeal.  *See Vance*, 90 F.3d at 1149; *see also Plott v. Gen. Motors Corp., Packard Elec. Div.*, 71 F.3d 1190, 1196 (6th Cir. 1995).

Mattingly did not file a formal Rule 56(d) affidavit regarding the audit materials. Nor did he file any language with the district court setting forth "specified reasons, [that he could not] present facts essential to justify [his] opposition" pursuant to Rule 56(d). Thus, Mattingly did not preserve the issue of whether the district court abused its discretion in not ruling on his pending objections regarding discovery. *See Plott*, 71 F.3d at 1196–97 (holding that failing to provide a contemporary affidavit seeking additional discovery to oppose summary judgment precludes a finding of an abuse of discretion).

## IV.

For these reasons, we AFFIRM the judgment of the district court.